## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

KIMBERLY FAYE KUNNA,

     *Plaintiff*,

*v.*                           CASE NO. 11-CV-15273

COMMISSIONER OF             DISTRICT JUDGE DENISE PAGE HOOD
SOCIAL SECURITY,           MAGISTRATE JUDGE CHARLES E. BINDER

     *Defendant*.

_____/

### MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION[1]

## I.    RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **DENIED**, that Defendant's Motion for Summary Judgment be **GRANTED**, and that the findings of the Commissioner be **AFFIRMED**.

## II.    REPORT

### A.    Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to this magistrate judge for the purpose of reviewing the Commissioner's decision denying Plaintiff's claims for a period of disability, for disability

---

[1]The format and style of this Report and Recommendation are intended to comply with the requirements of the E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (Dec. 17, 2002), the recently amended provisions of Fed. R. Civ. P. 5.2(c)(2)(B), E.D. Mich. Administrative Order 07-AO-030, and guidance promulgated by the Administrative Office of the United States Courts found at: http://jnet.ao.dcn/img/assets/5710/dir7-108.pdf. This Report and Recommendation only addresses the matters at issue in this case and is not intended for publication in an official reporter or to serve as precedent.

insurance benefits ("DIB"), and for supplemental security income ("SSI") benefits. This matter is currently before this Court on cross-motions for summary judgment. (Docs. 10, 11.)

Plaintiff was 48 years of age at the time of the most recent administrative hearing. (Transcript, Doc. 8 at 29, 119, 122.) Plaintiff's employment history includes work as a cashier, an assistant manager, and a certified nurse assistant. (Tr. at 148.) Plaintiff filed the instant claims on March 13, 2008, alleging that she became unable to work on August 14, 2004. (Tr. at 119, 122.) The claims were denied at the initial administrative stages. (Tr. at 58, 59.) In denying Plaintiff's claims, the Commissioner considered disorders of back, discogenic and degenerative, and affective disorders as possible bases for disability. (*Id.*) On July 12, 2010, Plaintiff appeared before Administrative Law Judge ("ALJ") Mary Ann Poulose, who considered the application for benefits *de novo*. (Tr. at 8-23; 29-57.) In a decision dated September 16, 2010, the ALJ found that Plaintiff was not disabled as of the alleged onset date, but became disabled on April 20, 2010, and has continued to be disabled through the date of the decision. (Tr. at 12, 23.) Plaintiff requested a review of this partially favorable decision on October 6, 2010. (Tr. at 5-7.)

The ALJ's decision became the final decision of the Commissioner, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004), on November 16, 2011, when the Appeals Council denied Plaintiff's request for review. (Tr. at 1-4.) On December 1, 2011, Plaintiff filed the instant suit seeking judicial review of the Commissioner's unfavorable decision.

### B.    Standard of Review

In enacting the social security system, Congress created a two-tiered structure in which the administrative agency handles claims and the judiciary merely reviews the determination for exceeding statutory authority or for being arbitrary and capricious. *Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 890, 107 L. Ed. 2d 967 (1990). The administrative process itself is

multifaceted in that a state agency makes an initial determination that can be appealed first to the agency itself, then to an ALJ, and finally to the Appeals Council. *Bowen v. Yuckert*, 482 U.S. 137, 142, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987). If relief is not found during the administrative review process, the claimant may file an action in federal district court. *Id.*; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986) (en banc).

This Court has original jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005). *See also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). In deciding whether substantial evidence supports the ALJ's decision, "we do not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). *See also Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007). *See also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility'") (citing *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence")); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) (an "ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making

3

a determination of disability"). "However, the ALJ is not free to make credibility determinations based solely upon an 'intangible or intuitive notion about an individual's credibility.'" *Rogers,* 486 F.3d at 247 (quoting S.S.R. 96-7p, 1996 WL 374186, at *4).

If supported by substantial evidence, the Commissioner's findings of fact are conclusive. 42 U.S.C. § 405(g). Therefore, a court may not reverse the Commissioner's decision merely because it disagrees or because "there exists in the record substantial evidence to support a different conclusion." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006). *See also Mullen*, 800 F.2d at 545. The scope of a court's review is limited to an examination of the record only. *Bass,* 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers,* 486 F.3d at 241. *See also Jones*, 336 F.3d at 475. "The substantial evidence standard presupposes that there is a 'zone of choice' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted) (citing *Mullen*, 800 F.2d at 545).

When reviewing the Commissioner's factual findings for substantial evidence, a reviewing court must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. App'x 496, 508 (6th Cir. 2006) ("[a]n ALJ can consider all the evidence

4

without directly addressing in his written decision every piece of evidence submitted by a party");

*Van Der Maas v. Comm'r of Soc. Sec.*, 198 Fed. App'x 521, 526 (6th Cir. 2006).

###    C.    Governing Law

The "[c]laimant bears the burden of proving his entitlement to benefits." *Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994). *Accord Bartyzel v. Comm'r of Soc. Sec.*, 74 Fed. App'x 515, 524 (6th Cir. 2003). There are several benefits programs under the Act, including the DIB program of Title II, 42 U.S.C. §§ 401 *et seq.*, and the SSI program of Title XVI, 42 U.S.C. §§ 1381 *et seq.* Title II benefits are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI benefits are available to poverty stricken adults and children who become disabled. F. Bloch, Federal Disability Law and Practice § 1.1 (1984). While the two programs have different eligibility requirements, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe

impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston,* 245 F.3d at 534. "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates." *Colvin,* 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his] impairments and the fact that [he] is precluded from performing [his] past relevant work[.]" *Jones*, 336 F.3d at 474 (cited with approval in *Cruse,* 502 F.3d at 540). If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the Commissioner. *Combs v. Comm'r*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [claimant] could perform given [his] RFC [residual functional capacity] and considering relevant vocational factors." *Rogers,* 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D.    ALJ Findings

The ALJ applied the Commissioner's five-step disability analysis to Plaintiff's claim and found at step one that Plaintiff met the insured status requirements through December 31, 2009, and that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of August 14, 2004. (Tr. at 14.) At step two, the ALJ found that Plaintiff's herniated disc of the cervical spine (status post-fusion), chronic obstructive pulmonary disorder, degenerative disc

6

disease of the lumbar spine, and depression were "severe" within the meaning of the second sequential step as of the alleged onset date and that as of the established onset date of disability, April 20, 2010, Plaintiff also has the severe impairments of carpal tunnel syndrome bilaterally, right shoulder tear and tendinosis, right knee tear, and left knee mild ACL sprain. (*Id.*) At step three, the ALJ found no evidence that Plaintiff's combination of impairments met or equaled one of the listings in the regulations. (Tr. at 15-17.) At step four, the ALJ found that Plaintiff could not perform any of her past relevant work. (Tr. at 21.) The ALJ also found that on the alleged disability onset date, Plaintiff was a younger individual – age 18 to 44. (*Id.*) At step five, the ALJ found that prior to April 20, 2010, the date Plaintiff became disabled, Plaintiff could perform a limited range of light work. (Tr. at 17-20.) Therefore, the ALJ found that Plaintiff was not disabled from the alleged onset date of August 14, 2004, through April 10, 2010. (Tr. at 21-23.)

### E.    Administrative Record

A review of the relevant medical evidence contained in the administrative record indicates that on August 16, 2004, Plaintiff was treated in the emergency room for cephalgia and cervical strain that had continued for two days after she had been "kicked in the head by a combative senior resident at the facility" where Plaintiff worked as a nursing aid. (Tr. at 204.) X-rays of the cervical spine were "unremarkable." (Tr. at 208.) A CT scan of the brain was also "unremarkable." (Tr. at 209.) Plaintiff was "discharged with Flexeril and instructed to follow-up with her primary care physician[.]" (Tr. at 206.)

On December 1, 2004, Richard Easton, M.D., examined Plaintiff and noted that an MRI "shows a large left-sided foraminal disc herniation causing compression at C5-C6 level." (Tr. at 293, 302.) Dr. Easton also discussed the importance of smoking cessation with Plaintiff. (*Id.*) On that same date, Plaintiff completed a neck disability index form where she indicated that: her pain

was "moderate[,]" it was "painful" to look after herself; that she had to be "slow and careful[,]" that her pain prevented her from lifting heavy weights, although she could "manage light to medium weights if they are conveniently positioned[,]" that she can read as much as she wants with only "moderate pain" in her neck, that she had "headaches almost all the time[,]" that should was able to "concentrate fully" when she wanted to with only "slight difficulty[,]" that she could not do her "usual work[,]" that she wasn't able to drive her car as long as she desired because of "moderate neck pain[,]" that her sleep was "greatly disturbed (3-5 hrs sleep lost)[,]" and that she was "able to engage in a few of [her] usual recreational activities because of neck pain[.]" (Tr. at 306-07.)

On February 28, 2005, Plaintiff underwent a gastroscopy which showed her "esophagus was entirely normal" and a colonoscopy. (Tr. at 633.) The colonoscopy report stated that "nothing [was] identified to account for the crampy abdominal pain nor the diarrhea, however the histopathology may show some microscopic colitis." (*Id.*) "If all negative, she may be considered even for a capsule study of the small intestine to fully rule out Crohn's disease as the cause of her current picture." (*Id.*)

On March 5, 2005, chest x-rays of Plaintiff's chest showed "[n]o acute process" and "no pleural fluid, mass, congestion or pneumothorax," despite Plaintiff's complaints of "[d]ifficulty in breathing." (Tr. at 621.)

On March 8, 2005, Mark Zohoury, D.O., noted that Plaintiff "was seen in the Emergency Room four days ago" but had "continued to decline" so she would be admitted for "exacerbation of COPD/asthmatic bronchitis." (Tr. at 368.) Emergency room records show that Plaintiff "thinks that she is going to leave against medical advice secondary to the inability to smoke at will." (Tr.

at 367.) Dr. Zohoury noted that Plaintiff is a "heavy smoker" who smokes "at least a pack of cigarettes a day" and "has done so for over 30 years." (Tr. at 368.)

Plaintiff underwent a capsule endoscopy of the small intestine on March 17, 2005, which was normal "with the exception of the peculiar finding in the upper jejunum that may have been residual food content adherent or transiting clot but an unlikely appearance for a neoplasm. Findings of Crohn's disease are not seen." (Tr. at 310.)

On May 3, 2005, x-rays of the cervical spine showed "mild encroachment of the C4-5 neural foramina on the left. Otherwise, . . . no intrinsic osseous or traumatic abnormality. The height and alignment appear satisfactory. The disc spaces are generally well maintained. No fracture of subluxation is seen." (Tr. at 311.)

On November 14 and December 3, 2005, x-rays of Plaintiff's chest showed "[n]o active pulmonary disease." (Tr. at 600, 607.) On February 2, 2006, x-rays of Plaintiff's chest showed "[n]o active pulmonary disease" and x-rays of her knees showed "[m]inimal degenerative changes . . . [and] no other significant osseous or articular abnormality . . . . However, there [was] some soft tissue fullness in the area of the suprapatellar bursa suspicious for a small joint effusion." (Tr. at 575.)

Plaintiff underwent an anterior cervical discectomy and fusion C5-C6 on February 7, 2006, performed by Dr. Easton. (Tr. at 295.)

On April 26, 2006, Plaintiff sought treatment at Beaumont Hospital in Troy, Michigan, because of "[n]eck pain, numbness and tingling in the left arm, and also abdominal pain." (Tr. at 275.) Mark R. Zohoury, D.O., examined Plaintiff, admitted Plaintiff for a "short-stay" and ordered testing. (Tr. at 277.) Plaintiff's chest x-ray was normal and a CT of the abdomen and pelvis was also normal. (Tr. at 280, 571.)

On June 29, 2006, Plaintiff underwent a cervical and post myelogram CT which revealed "[f]ocal abnormality involving the intraspinal contents ventrally on the left C5-6 level is compatible with disc protrusion with some calcification." (Tr. at 325.) Based on this study, Dr. Easton stated that Plaintiff had "adequate decompression" and that he "would recommend continued conservative care, Medrol Dosepak, possible epidurals or selective C-7 nerve block. If nothing else helps, she may have to have foraminotomy for evaluation of that nerve root." (Tr. at 327.)

On November 17, 2006, Dr. Easton reviewed Plaintiff's MRI of the cervical spine and found "no evidence of residual cord compression.  I believe her problems are most likely secondary to scarring and permanent nerve damage." (Tr. at 262, 356-57.)

On January 29, 2007, chest x-rays were "normal[.]" (Tr. at 539, 546.)

On February 12, 2007, an MRI of Plaintiff's cervical spine showed "[s]pondylosis postoperative changes of the cervical spine" and there appeared to be "an eccentric spur in the left lateral recess at C5-C8 resulting in flattening of the cord. Study, however, is mildly degraded due to a metallic artifact." (Tr. at 223, 336.) An MRI of the lumbar spine taken the same day revealed "broad base disc bulge and central disc herniation associated with mild and relative central canal stenosis." (Tr. at 224, 337, 530.)

Plaintiff was discharged from physical therapy on February 28, 2007, and it was noted that she had "improved to 52% on the Functional Assessment Scale" and that she was "independent in demonstrating home exercise program and proper posture"; she was discharged because her "status plateaued." (Tr. at 227.)

On April 3, 2007, Plaintiff was treated by Gino Sessa, M.D., who diagnosed C6 and C7 radiculopathy on the left, history of cervical fusion, and possible clinical depression. (Tr. at 219.)

Plaintiff reported that she had "completed 15-18 sessions of physical therapy and that her symptoms [were] worse." (Tr. at 218.) Dr. Sessa found Plaintiff's strength to be 5/5 in all limbs except for "subtle weakness, 4+/5 noted at the left deltoid, biceps, pronator teres, and triceps." (*Id.*) In addition, Dr. Sessa noted a "normal gait pattern." (*Id.*) Dr. Sessa recommended that Plaintiff pursue a multidisciplinary pain clinic to manage her depression and he refilled her medication, but indicated that "[m]edication refills will not be given after her Vicodin ES prescription runs out." (Tr. at 219.) He "emphasized to her that she had three months to find an appropriate pain clinic or pain clinician to take over her care." (*Id.*)

On April 4, 2007, a cervical and lumbar myelogram revealed "[p]ost fusion changes at C5-C6 with residual disc protrusion or spurring seen posterolaterally on the left side," which was "unchanged from the prior exam," and "[r]ather mild spinal canal stenosis at the L4-L5 level." (Tr. at 350.)

Plaintiff was treated by Richard Easton, M.D. (Tr. at 239-315.) On May 18, 2007, Dr. Easton reviewed Plaintiff's MRIs and concluded:

> In the cervical spine she has a disc herniation inferior to her previous disc in the neck and left sided foraminal stenosis. In the lumbar spine, she has a herniated disc at the L4-5 level with left sided foraminal stenosis. Options are 1) physical therapy with anti-inflammatories, 2) the use of epidural steroids, and 3) surgical intervention. Surgery would be a revision anterior cervical discectomy and fusion or a lumbar laminectomy/discectomy. She also has a disc bulging or herniation at the 3-4 level with effacement of the cord.

(Tr. at 235, 339.) On June 1, 2007, Dr. Easton indicated that Plaintiff "failed conservative care and requires surgical intervention[.]" (Tr. at 236, 338.) Therefore, on July 12, 2007, Plaintiff underwent a "revision anterior cervical discectomy fusion C67, [with] removal plate, neurolysis, exploration fusion, allograft, hemicorpectomies, [and] cervical plate." (Tr. at 340.)

On January 4, 2008, x-rays of the lumbosacral spine showed "[m]ild degenerative changes" and x-rays of the abdominal series were "negative." (Tr. at 712.)

On April 30, 2008, Plaintiff sought treatment at the emergency room of Beaumont Hospital because of back pain. (Tr. at 644-45, 713-14.) Plaintiff was given prescription medications, it was noted that she "is ambulating without difficulty and now was discharged home to follow up with Dr. Easton." (Tr. at 645, 714.)

On May 31, 2008, Plaintiff was examined by E. Montasir, M.D., of Disability Determination Services ("DDS"). (Tr. at 661-68.) Dr. Montasir noted that Plaintiff "does not use an ambulation aid" but that she "wears braces on both knees." (Tr. at 662.) Dr. Montasir also noted "no history of TB or COPD," although Plaintiff was "[p]ositive for asthma, but no hospitalization over 24 hours." (*Id.*) The doctor noted that Plaintiff had a "normal gait and stance . . . [and] managed to get on and off the examination table without difficulty." (*Id.*) "Her straight leg raising was 60 degrees from lying and 40 degrees from sitting position[,] . . . [there was] no joint deformity[,] . . . [and] well-healed scarring of surgery on the right knee, however the range of motion was satisfactory." (Tr. at 663.) Although there was "some numbness or paresthesia in the left upper extremity[,]" "[m]uscle power was 5/5 throughout." (*Id.*) It was also noted that Plaintiff's diabetes was controlled with medication and that she had never been hospitalized nor had any complications from diabetes. (*Id.*)

A Physical Residual Functional Capacity ("RFC")Assessment was completed on June 9, 2008, by Jack Kaufman, M.D. (Tr. at 672-79.) The assessment concluded that Plaintiff was able to occasionally lift 20 pounds, frequently lift 10 pounds, stand or walk for about 6 hours in an 8-hour workday, and sit for about 6 hours in an 8-hour workday. (Tr. at 673.) There were no postural, manipulative, visual, communicative or environmental limitations established, except that Plaintiff

should avoid even moderate exposure to vibration. (Tr. at 674-76.) There were no treating or examining source statements for comparison. (Tr. at 678.)

On June 10, 2008, Dr. Zohoury completed a two-page form entitled "Neurologic and Orthopedic Supplemental Report" where he checked boxes indicating Plaintiff's current abilities. Dr. Zohoury indicated that Plaintiff could sit and stand for 10-15 minutes, could not bend, stoop, carry, push or pull, but could button clothes with assistance, could not tie shoes, could dress with assistance, could dial a telephone and open a door, could not make a fist or pick up a coin, could pick up a pencil and write, could not squat and arise from squatting, could get on and off an examining table, could climb stairs slowly, could put finger to finger and finger to nose but could not put heel to shin. (Tr. at 680.) Dr. Zohoury also found that Plaintiff's reflexes were absent in her biceps, ulnar, Achilles, and Babinski, but were normal in her triceps, brachial radialis, Hoffman's and Patellar in both extremities. (*Id.*) Dr. Zohoury also found that Plaintiff could not walk on heels and toes or in tandem and that her gait was stable and within normal limits, yet he also found that her gait was a slow shuffling gait and a lurching gait and that evidence supported the need for a walking aid. (Tr. at 681.) He further found Plaintiff's grip strength was 1/5 on the right and 2/5 on the left. (*Id.*)

On July 1, 2008, Plaintiff was examined by DDS physician Basivi Baddigam, M.D., who diagnosed Plaintiff with "[m]ajor depression, recurrent type; [p]anic disorder and agoraphobia[.]" (Tr. at 690.) At Axis III, "[n]oninsulin dependent diabetes mellitus, acid reflux, asthma, neck pain, back pain, pain in the knees and hands" was found, Plaintiff was assessed a GAF score of 50 and was given a "guarded" prognosis. (Tr. at 690.)

A Mental RFC Assessment was completed on July 14, 2008, by Zahra Yousuf, M.D. (Tr. at 723-26.) The assessment concluded that Plaintiff was moderately limited in her ability to

2:11-cv-15273-DPH-CEB   Doc # 13   Filed 06/26/12   Pg 14 of 31   Pg ID 882

understand and remember detailed instructions, her ability to carry out detailed instructions, her ability to maintain attention and concentration for extended periods, her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms, and her ability to perform at a consistent pace without an unreasonable number and length of rest periods, but was otherwise not significantly limited in understanding and memory or sustained concentration and persistence. (Tr. at 723-24.) Plaintiff was also found to be moderately limited in the ability to interact appropriately with the general public and the ability to set realistic goals or make plans independently of others, but was otherwise not significantly limited in social interaction or adaptation. (Tr. at 724.) The assessment concluded that "[e]vidence in the file indicates that the claimant retains the mental capacity to understand, remember, maintain concentration, pace, get along with others, [and] respond to change in order to complete simple unskilled tasks on a sustained basis." (Tr. at 725.)

A Psychiatric Review Technique was also completed on July 14, 2008, by Dr. Yousuf. (Tr. at 727-40.) Plaintiff was diagnosed with affective disorders and anxiety-based disorders, i.e., major depression, recurrent type, and panic disorder with agoraphobia. (Tr. at 727, 730, 732.) Dr. Yousuf concluded that Plaintiff was moderately limited in activities of daily living and in maintaining concentration, persistence or pace and was mildly limited in maintaining social functioning. (Tr. at 737.)

Plaintiff underwent a Psychiatric Evaluation and Mental Status Examination by Nadimpalli Raju, M.D., on July 17, 2009. (Tr. at 741-43.) The doctor noted that Plaintiff reported "she came to a point where she is very violent where she has pulled out a baseball bat on her daughter . . . [has been] extremely depressed, not sleeping, not eating, has homicidal thoughts about her daughter but no idea[tion], and very emotional. Requested counseling." (Tr. at 741.) Dr. Raju found Plaintiff

to be "oriented to time, place, person, and situation," and her "[m]emory to recent and remote events [was] grossly intact." (Tr. at 742.) Dr. Raju also stated that Plaintiff had "mood fluctuations[,] but much of that seems to be related to her medical conditions and the lack of treatment for the same." (*Id.*) Dr. Raju diagnosed Plaintiff with "[d]epression secondary to medical condition" and "[c]yclothymic personality disorder versus bipolar disorder, hypomanic[,]" and she was assessed a GAF score of 50. (*Id.*) Dr. Raju did "not see any clear indication to use psychotropic medications" and suggested individual therapy. (*Id.*)

On July 31, 2009, Plaintiff was re-evaluated at Detroit East, Inc., Community Mental Health, and was provided with prescription medications. (Tr. at 740.) Plaintiff continued to be treated and prescriptions adjusted through September 2009. (Tr. at 741-46.)

On October 29, 2009, Dr. Zohoury filled out a two-page form for the DDS wherein he concluded that Plaintiff could occasionally lift less than 10 pounds but could never lift any weight heavier than that. (Tr. at 748.) Dr. Zohoury did not check any boxes regarding standing/walking and sitting, and he indicated that Plaintiff could not perform simple grasping, reaching, pushing/pulling or fine manipulating with either hands or arms, nor could she operate foot or leg controls. (Tr. at 748.) Dr. Zohoury also concluded that Plaintiff was limited in comprehension, but not in memory, sustained concentration, following simple directions, reading/writing or social interaction. (*Id.*) Dr. Zohoury also wrote, however, that Plaintiff had "intermittent memory impairment." (*Id.*)

On March 18, 2010, a CT of Plaintiff's abdomen and pelvis showed "[h]epatomegaly with the liver measuring up to 24 cm long," fatty liver, cholecystectomy clips, nonobstructive bowel gas pattern, hysterectomy, and that the urinary bladder was "not well-distended, with apparent

15

urinary bladder wall thickening likely from under distention, [but] [n]o urinary stones[,]" and "[s]mall-to-moderate pericardial effusion without cariomegaly." (Tr. at 758-59.)

On April 1, 2010, an MRI of Plaintiff's cervical spine showed "[m]idline herniated disc at C4-5 and C6-7" and "[p]ost-operative changes with fusion at the level of C5-6." (Tr. at 757.)

On April 2, 2010, an MRI of Plaintiff's thoracic spine showed "T5-6 and T6-7 facet arthrosis with otherwise unremarkable thoracic spine MRI examination." (Tr. at 756.)

On April 6, 2010, an MRI of Plaintiff's lumbar spine revealed

[r]elatively mild multilevel lumbar spondylosis and mild lower lumbar facet arthrosis. Small central/right paracentral disc protrusion at L4-5 indents the ventral thecal sac and produces borderline mild spinal canal stenosis. Minimal disc bulges at L3-4 and L5-S1. Mild narrowing of the inferior aspects of the neural foramina bilaterally at the L4-5 level.

(Tr. at 755.) In addition, the MRI showed "[m]inimal lumbar levoscoliosis," that the alignment was "otherwise normal," and that there was "[n]o evidence of fracture." (*Id.*)

The ALJ concluded that Plaintiff was disabled as of April 20, 2010.

On April 22, 2010, R. Sazgari, M.D., reviewed MRI test results of the right knee and found "[t]hree-compartment hyaline articular cartilage thinning of the knee, most pronounced in the lateral femorotibial and patellofemoral joint spaces[,]" "[c]omplex tearing of the lateral meniscus, extending from the lateral meniscal body into the posterior and anterior horns[,]" "[m]ild surface fraying and intrasubstance degeneration of the medial meniscus[,]" and "[s]mall joint effusion." (Tr. at 751.) Additionally, the MRI revealed "[s]ynovial versus ganglion cyst at the posteromedial aspect of the joint space, possibly communicating with the semimembranous-gastronemius bursa." (*Id.*)

On June 9, 2010, an EMG of Plaintiff's upper extremities revealed "[b]ilateral carpal tunnel syndrome, left greater than right." (Tr. at 762.)

On June 13, 2010, an MRI of Plaintiff's right shoulder revealed "[a]ctomioclavicular arthropathy, with mild distal clavicular and acromial reactive bone marrow edema, resultant effacement of the underlying supraspinatus myotendinous junction[,]" "[c]oncave inferior (Type IV) acromial undersurface, which can predisposed to clinical impingement syndrome[,]" "[t]endinosis of the rotator cuff[,]" "[m]ild articular sided fraying of the supraspinatus[,]" "[p]robable nondisplaced tear of the anteroinferior labrup[,]" "[m]ild glenohumeral joint fluid[,]" and "[m]ild fatty streaking and edema of the teres minor muscle, likely related to an early denervation atrophy in an axillary nerve distribution." (Tr. at 761.)

In her daily activity report, Plaintiff stated that she was able to take care of her pets on good days and that her daughter cares for them on bad days. (Tr. at 157.) Plaintiff indicated that she was unable to lift her arms to put shirts over her head, was unable to wash her hair, brush her hair, shave her legs or reach her backside, but that she could feed herself with her right hand. (*Id.*) Plaintiff stated that she could sometimes cook "one pan meals" but that she usually microwaves her meals or makes sandwiches and that this cooking takes "about an hour." (Tr. at 158.) Plaintiff indicated that she cannot do any more because she "can't stand for too long (back-spine) and [she] can't use her arms for too long." (*Id.*) Plaintiff stated that she can "sometimes" dust and load the dishwasher and that her daughter helps remind her of things that need to be done. (Tr. at 159.) Plaintiff does not do yard work because of pain, but she does drive and ride in cars, although she prefers others to drive. (Tr. at 159.) Plaintiff indicated she shops in stores "when necessary and only as long as it takes." (*Id.*) Plaintiff is able to count change and use a checkbook, but indicated that she is not good at paying bills and handling savings because she forgets bills are due and she has to return items because she does not buy wisely anymore. (Tr. at 159-60.) When asked about hobbies, Plaintiff wrote "nothing anymore." (Tr. at 160.) Plaintiff described socializing with others

17

once or twice a week on the phone and going to doctor's appointments. (*Id.*) As to getting along with others, Plaintiff stated she is "always angry and depressed at myself and lifestyle and I take it out on my son and daughter." (Tr. at 161.) Plaintiff indicated that she has used a knee brace since 1998 and a back brace since 2006. (Tr. at 162.)

At the administrative hearing, Plaintiff testified that although she has a driver's license, she was told by her doctor in 2004 not to drive. (Tr. at 38.) Plaintiff testified that on days when she cannot groom or dress herself, her 22-year-old daughter helps her and that this occurs approximately two to three times a week. (Tr. at 39-40.) Plaintiff also testified that her daughter does the cooking but that she can microwave a dinner if she needs to. (Tr. at 40.) Plaintiff indicated that she helps her daughter do dishes and that her daughter does the laundry most of the time, except for good days when Plaintiff is able to go down the stairs to do laundry. (Tr. at 40-41.) Plaintiff stated that she is able to go grocery shopping on good days. (Tr. at 41-42.) Plaintiff indicated that she is "not allowed to lift anything over four pounds" and she is "not allowed to do anything repetitive with [her] arms." (Tr. at 44.) Plaintiff stated she could work doorknobs and could hold a coffee mug with two hands. (Tr. at 45.)

The ALJ asked the vocational expert ("VE") to consider a person with Plaintiff's background:

> limited to, let's start with light work, that does not allow, only occasional crouching, crawling, stooping, kneeling, climbing and avoiding concentrated exposure to environmental irritants humidity, fumes, temperature extremes, gases, smoke, odors and no frequent fingering with the left upper extremity[.]

(Tr. at 54.) The VE responded that such a person could not perform Plaintiff's past relevant work but could perform other light, unskilled occupations such as the 200,000 hostess jobs, 78,000 usher jobs and 110,000 information clerk jobs in the national economy. (Tr. at 55.) If the additional restriction of only occasional handling or fingering with both extremities were added, the VE

responded such a person could still perform the usher and information clerk jobs. (Tr. at 55-56.) When the ALJ asked if the person were limited to sedentary work, the VE responded that there would be no work available because "occupations at the sedentary level of physical tolerance would be, require the individual to utilize their bilateral upper extremity on at least a frequent basis in order to perform work-related tasks." (Tr. at 56.)

### F.     Analysis and Conclusions

### 1.     Legal Standards

The ALJ determined that during the time Plaintiff qualified for benefits, she possessed the residual functional capacity to perform a limited range of "sedentary" work. (Tr. at 17-20.) However, the analysis used and the jobs the ALJ indicated that Plaintiff could perform were based on the VE's testimony as to jobs at the light unskilled level. (Tr. at 54-56.) Plaintiff did not mention this error or challenge the ALJ's findings based on this error. I suggest that this error is harmless in that the ALJ made the proper findings but simply labeled the findings incorrectly as sedentary when, in fact, they regarded light work. *See Dalton v. Comm'r of Soc. Sec.*, No. 11-11148, 2012 WL 405176, at *3, n.3 (E.D. Mich. Jan. 23, 2012) (noting harmless administrative opinion error stating that Plaintiff's past work was unskilled light when it was done at the sedentary level because such an error would not change the final determination). Therefore, I will analyze the claim in the context of light work.

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional

> limiting factors such as loss of fine dexterity or inability to sit for long
> periods of time.

20 C.F.R. § 404.1567(b).

After review of the record, I suggest that the ALJ utilized the proper legal standard in his application of the Commissioner's five-step disability analysis to Plaintiff's claim. I turn next to the consideration of whether substantial evidence supports the ALJ's decision.

### 2.    Substantial Evidence

Plaintiff contends that the ALJ's decision is not supported by substantial evidence. (Doc. 10.) As noted earlier, if the Commissioner's decision is supported by substantial evidence, the decision must be affirmed even if this Court would have decided the matter differently and even where substantial evidence supports the opposite conclusion. *McClanahan,* 474 F.3d at 833; *Mullen,* 800 F.2d at 545. In other words, where substantial evidence supports the ALJ's decision, it must be upheld.

Specifically, Plaintiff contends that the ALJ did not give appropriate weight to the opinions of Dr. Zohoury and Plaintiff's "treating psychiatrists at the Detroit East Community Mental Health Clinic who diagnosed depressive disorder, panic attacks and an inability to function normally due to her physical infirmities." (Doc. 10 at 11.) Plaintiff further argues that the "ALJ failed to articulate a realistic residual functional capacity ("RFC")" (Doc. 10 at 11-12), and that Plaintiff's "complaints and symptoms should have been found to be credible." (Doc. 10 at 12-13.)

### a.    Treating Sources

Plaintiff contends that the ALJ did not give appropriate weight to the opinions of Dr. Zohoury and Plaintiff's "treating psychiatrists at the Detroit East Community Mental Health Clinic who diagnosed depressive disorder, panic attacks and an inability to function normally due to her physical infirmities." (Doc. 10 at 11.) In weighing the opinions and medical evidence, the ALJ

20

must consider relevant factors such as the length, nature and extent of the treating relationship, the frequency of examination, the medical specialty of the treating physician, the opinion's evidentiary support, and its consistency with the record as a whole. 20 C.F.R. § 404.1527(d)(2)-(6). Therefore, a medical opinion of an examining source is entitled to more weight than a non-examining source and a treating physician's opinion is entitled to more weight than a consultative physician who only examined the claimant one time. 20 C.F.R. § 404.1527(d)(1)-(2). *See also Rogers*, 486 F.3d at 242 (stating that the "treating physician rule," which provides that "greater deference is usually given to the opinions of treating physicians than to those of non-treating physicians," is a key governing standard in social security cases). "Moreover, when the physician is a specialist with respect to the medical condition at issue, . . . her opinion is given more weight than that of a non-specialist." *Johnson v. Comm'r of Soc. Sec.*, 652 F.3d 646, 651 (6th Cir. 2011).

The opinion of a treating physician should be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent with the other substantial evidence in [the] case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. § 404.1527(d)(2). If the ALJ declines to give controlling weight to a treating source's opinion, then he must use the following factors to determine what weight the opinion should be given: "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson*, 378 F.3d at 544. Where the ALJ "failed to conduct the balancing of factors to determine what weight should be accorded these treating source opinions . . . , [t]his alone constitutes error, as '[a] finding that a treating source medical opinion . . . is not entitled to controlling weight [does] not [mean] that the opinion should be rejected.'" *Cole v. Comm'r of Soc.*

*Sec.*, 661 F.3d 931, 938652 F.3d 653, 660 (6th Cir. 2011) (quoting *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 408 (6th Cir. 2009)).

A physician qualifies as a treating source if the claimant sees the physician "with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the] medical condition." 20 C.F.R. § 404.1502. "The opinion of a non-examining physician, on the other hand, 'is entitled to little weight if it is contrary to the opinion of the claimant's treating physician.'" *Adams v. Massanari*, 55 Fed App'x 279, 284 (6th Cir. 2003) (quoting *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987)).

"Claimants are entitled to receive good reasons for the weight accorded their treating sources independent of their substantive right to receive disability benefits." *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight." S.S.R. 96-2p, 1996 WL 374188, at *5 (1996). *See also Rogers*, 486 F.3d at 242. "This requirement is not simply a formality; it is to safeguard the claimant's procedural rights." *Cole*, 2011 WL 2745792, at *4661 F.3d at 937. "[A] failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight accorded the opinions denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.

The treating physician rule applies when the treating source opinion is a *medical* opinion; however, "[w]hen a treating physician instead submits an opinion on an issue reserved to the Commissioner – such as whether the claimant is 'disabled' or 'unable to work' – the opinion is not

entitled to any particular weight." *Turner v. Comm'r of Soc. Sec.*, 381 Fed. App'x 488, 492-93 (6th Cir. 2011) (citing 20 C.F.R. §§ 404.1527(d), 416.927(d), 1527(e), 416.927(e); S.S.R. 96-5p; and *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007)).

To the extent that Plaintiff reads Dr. Zohoury's findings as a statement that she is disabled for social security purposes, this opinion is not entitled to any particular weight since "[i]t is well settled that the ultimate issue of disability is reserved to the Commissioner." *Kidd v. Comm'r*, 283 Fed. App'x 336, 341 (6th Cir. 2008); *Turner*, 381 Fed. App'x at 492-93. As to the underlying opinions, I suggest that the ALJ's findings were made under the proper parameters and are supported by substantial evidence.

Both of Dr. Zohoury's reports that Plaintiff argues are entitled to controlling weight were forms with checkmarks placed next to the conclusions regarding Plaintiff's RFC. I suggest that these checkmarks on forms are not medical opinions that are " entitled to any particular weight." *Turner,* 381 Fed. App'x at 492-93; *Maloney v. Comm'r of Soc. Sec.*, No. 10-2583, 2012 WL 1676683, at *4 (6th Cir. May 15, 2012) (the "nature of the opinion, i.e., a form with checked boxes, provided the ALJ with "good reason to give Dr. Hughett's opinion less than controlling weight").

Even if the forms with checked boxes were considered medical opinions, I suggest that the ALJ's stated reasons for declining to give it more than little weight are sufficient to satisfy the regulations and are supported by substantial evidence. The ALJ expressly considered the relevant factors and incorporated the underlying medical records and findings derived from physical examinations conducted by Drs. Zohoury and Easton. (Tr. at 20-21.)

However, the ALJ also determined that Dr. Zohoury's conclusions that Plaintiff could not bend, stoop, carry, push, pull or lift more than 10 pounds occasionally and needed a walking aid

were inconsistent with Dr. Zohoury's own findings that Plaintiff had a normal gait pattern, 5/5 strength in all her extremities (with subtle weakness), a full range of motion in the neck and lumbar spine, intact fine and gross dexterity, unremarkable sensory and motor reflex, and a stable gait within normal limits. (Tr. at 19, 680-81, 748.)

Before completing the forms, Dr. Zohoury made no notations regarding such drastic limitations. In addition, there were internal inconsistencies in the forms completed by Dr. Zohoury. As noted by the ALJ, although Dr. Zohoury found that Plaintiff's gait was stable and within normal limits, he also found that her gait was slow, shuffling and lurching, and that the evidence supported the need for a walking aid. (Tr. at 681.) Further, although Dr. Zohoury indicated on one form that Plaintiff could only sit, stand, or walk for ten to fifteen minutes, on another form he did not note any limitations in sitting, standing or walking; he made no notations in that category at all. (Tr. at 681, 748.) Finally, although Dr. Zohoury concluded that Plaintiff was not limited in memory, he noted that Plaintiff had "intermittent memory impairment." (Tr. at 748.)

It should also be noted that Dr. Zohoury's treatment focused on Plaintiff's asthma and COPD, and his concerns regarding her heavy smoking habits. (Tr. at 367-68.) Dr. Zohoury's area of expertise did not include neurological or psychological impairments, which comprised the bulk of the questions on the forms completed by Dr. Zohoury. Instead, Dr. Easton had the expertise with respect to Plaintiff's spinal and other neurological issues.

I also suggest that there is nothing in Dr. Easton's notes or treatment records that conflict with the ALJ's findings; thus, the ALJ did not improperly weigh Dr. Easton's opinions. After the anterior cervical discectomy and fusion that Dr. Easton performed on February 7, 2006 (Tr. at 295), Dr. Easton noted that tests showed that Plaintiff had "adequate decompression" and that he "would recommend continued conservative care . . . ." (Tr. at 327.) On November 17, 2006, Dr.

24

Easton reviewed Plaintiff's MRI of the cervical spine and found "no evidence of residual cord compression" and stated that he "believe[d] her problems [were] most likely secondary to scarring and permanent nerve damage." (Tr. at 262, 356-57.) After conservative treatment did not relieve Plaintiff's symptoms, Dr. Easton performed a revision discectomy and fusion. Again, there is nothing in Dr. Easton's records that is inconsistent with the ALJ's findings.

In addition to the findings of DDS examining physicians and the RFC assessments that the ALJ incorporated, Dr. Sessa's findings support the ALJ's conclusion. Dr. Sessa found Plaintiff's strength to be 5 out of 5 in all limbs except for "subtle weakness, 4+/5 noted at the left deltoid, biceps, pronator teres, and triceps." (*Id.*) In addition, Dr. Sessa noted a "normal gait pattern." (*Id.*)

As to the treating psychiatrists from Detroit East Community Mental Health, I suggest that there is noting in their records that is inconsistent with the ALJ's findings; thus, he did not improperly weigh that evidence. Dr. Raju found that Plaintiff was "oriented to time, place, person, and situation" and her "[m]emory to recent and remote events [was] grossly intact." (Tr. at 742.) Dr. Raju also stated that Plaintiff had "mood fluctuations but much of that seems to be related to her medical conditions and the lack of treatment for the same." (*Id.*) Dr. Raju recommended conservative treatment, did "not see any clear indication to use psychotropic medications," and suggested individual therapy. (*Id.*)

I therefore suggest that substantial evidence supports the weight given Plaintiff's treating sources.

### b.    Credibility Determination

Plaintiff further contends that her "complaints and symptoms should have been found to be credible." (Doc. 10 at 12-13.) When a disability determination that would be fully favorable to a claimant cannot be made solely on the basis of the objective medical evidence, an ALJ must

analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health and Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, No. 09-5773, 2011 WL 180789 at *4 (6th Cir. Jan. 19, 2011) (citing *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001)); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004). When weighing credibility, an ALJ may give less weight to the testimony of interested witnesses. *Cummins v. Schweiker*, 670 F.2d 81, 84 (7th Cir. 1982) ("a trier of fact is not required to ignore incentives in resolving issues of credibility"); *Krupa v. Comm'r of Soc. Sec.*, No. 98-3070, 1999 WL 98645 at *3 (6th Cir. Feb. 11, 1999) (unpublished). However, "[i]f an ALJ rejects a claimant's testimony as incredible, he must clearly state his reasons for doing so." *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994).

The social security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p. In order for pain or other subjective complaints to be considered disabling, there must be (1) objective medical evidence of an underlying medical condition, and (2) objective medical evidence that confirms the severity of the alleged disabling pain arising from that condition, or objectively, the medical condition is of such severity that it can reasonably be expected to produce such disabling pain. *See id.*; *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994); *Felisky*, 35 F.3d at 1038-39; *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986).

Therefore, the ALJ must first consider whether an underlying medically determinable physical or mental impairment exists that could reasonably be expected to produce the individual's

pain or other symptoms. Secondly, after an underlying physical or mental impairment is found to exist that could reasonably be expected to produce the claimant's pain or symptoms, the ALJ then determines the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which the symptoms limit the claimant's ability to do basic work activities. *Id.* Although a claimant's description of his physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," C.F.R. §§ 404.1528(a), 416.929(a), "[a]n individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded *solely* because they are not substantiated by objective medical evidence." S.S.R. 96-7p, at *1 (emphasis added). Instead, the ALJ must consider the following factors:

(i)     [D]aily activities;

(ii)    The location, duration, frequency, and intensity of . . . pain;

(iii)   Precipitating and aggravating factors;

(iv)    The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

(v)     Treatment, other than medication, . . . received for relief of . . . pain;

(vi)    Any measures . . . used to relieve . . . pain.

*Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); S.S.R. 96-7p, at *3. Furthermore, the consistency of the evidence, including a claimant's subjective statements, is relevant in determining a claimant's credibility. 20 C.F.R. § 404.1527(c); S.S.R. 96-7p, at *5.

In the instant case, the ALJ thoughtfully considered all the evidence of record and determined that beginning on April 20, 2010, Plaintiff's allegations regarding her symptoms and limitations were generally credible, citing among other things, MRIs and EMGs taken in June 2010 that showed Plaintiff's limited ability to use her bilateral upper extremities. (Tr. at 20.)

27

After examining the record evidence, I suggest that substantial evidence supports the ALJ's finding that Plaintiff's testimony regarding her level of pain was not fully credible. The ALJ specifically considered all six factors listed above. (Tr. at 17-18.) As to psychological treatment, Plaintiff was never hospitalized for depression and instead received only conservative or modest treatment, such as therapy and prescription medication, which is inconsistent with a finding of disability. (Tr. at 139, 140-43, 202-04, 225.) *See Myatt v. Comm'r of Soc. Sec.*, 251 Fed. App'x 332, 334-35 (6th Cir. 2007) (modest treatment regimen is inconsistent with a finding of total disability). As to physical treatment, although Plaintiff underwent a discectomy and a revision of the same and also had other impairments, her ongoing treatment consisted of prescription medication alone.

Although Plaintiff's impairments could reasonably be expected to cause the alleged symptoms, I suggest that substantial evidence supports the ALJ's conclusion that Plaintiff's statements regarding the intensity, persistence, and limiting effects are not entirely credible. (Tr. at 18.) A gastroscopy showed that her "esophagus was entirely normal" and a colonoscopy revealed that "nothing [was] identified to account for the crampy abdominal pain nor the diarrhea[.]" (Tr. at 633.) An endoscopy of the small intestine was also "[n]ormal" and ruled out Crohn's disease. (Tr. at 310.) CT scans and x-rays of the abdomen and pelvis were also normal. (Tr. at 280, 571, 712, 758-59.) Plaintiff's cervical and lumbar spine showed abnormalities, but they were "mild" or adequate or did not reveal cord compression. (Tr. at 224, 262, 311, 325-27, 337, 350, 356-57, 530, 712, 755-57.) Plaintiff's knees showed only "[m]inimal degenerative changes[.]" (Tr. at 575.) X-rays of Plaintiff's chest were normal and showed "[n]o active pulmonary disease." (Tr. at 280, 539, 546, 571, 575, 600, 607, 621.) Plaintiff's strength was consistently 5/5 or 4+/5 and her gait was consistently noted to be normal. (Tr. at 218, 645, 663, 714.) Plaintiff was

"oriented to time, place, person, and situation" and her "[m]emory to recent and remote events is grossly intact." (Tr. at 742.) I therefore suggest that substantial evidence supports the ALJ's credibility findings.

### c.    RFC Analysis

Plaintiff also argues that the "ALJ failed to articulate a realistic residual functional capacity ("RFC")" and failed to consider her mental limitations. (Doc. 10 at 11-12.) I suggest that the ALJ's RFC analysis included the only evidence regarding Plaintiff's mental limitations, the RFC assessment. The assessment concluded that "[e]vidence in the file indicates that the claimant retains the mental capacity to understand, remember, maintain concentration, pace, get along with others, [and] respond to change in order to complete simple unskilled tasks on a sustained basis." (Tr. at 725.) In addition, the minimal evidence regarding Plaintiff's mental limitations also supports the ALJ's findings. Dr. Raju found that Plaintiff was "oriented to time, place, person, and situation" and her "[m]emory to recent and remote events is grossly intact." (Tr. at 742.) Dr. Raju also stated that Plaintiff "has mood fluctuations but much of that seems to be related to her medical conditions and the lack of treatment for the same." (*Id.*)

As to the overall RFC analysis, I suggest that the hypothetical posed to the VE properly incorporated the limitations found in the RFC assessment and was in harmony with the objective record medical evidence and Plaintiff's own statements that she can manage light to medium weights, read as much as she wants to with only moderate pain in her neck, concentrate fully when she wants to with slight difficulty, cook for about an hour, dust, load the dishwasher, drive and ride in cars, shop in stores for "as long as it takes," socialize with others once or twice a week, and get herself to her doctor's appointments. (Tr. at 40-42, 158-60, 306-07.) *See Griffeth v. Comm'r of*

*Soc. Sec.*, 217 Fed. App'x 425, 429 (6th Cir. 2007); *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987).

      **3.**     **Conclusion**

For all these reasons, after review of the record, I conclude that the decision of the ALJ, which ultimately became the final decision of the Commissioner, is within that "zone of choice within which decisionmakers may go either way without interference from the courts," *Felisky*, 35 F.3d at 1035, as the decision is supported by substantial evidence.

## III.   <u>REVIEW</u>

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan*, 474 F.3d at 837; *Frontier Ins. Co.,* 454 F.3d at 596-97. Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be concise, but commensurate in detail with the objections, and shall address specifically, and in the same order raised, each issue contained within the objections.


                              s/ 𝔆𝔥𝔞𝔯𝔩𝔢𝔰 𝔈 𝔅𝔦𝔫𝔡𝔢𝔯
                              CHARLES E. BINDER
Dated: June 26, 2012          United States Magistrate Judge


                    **<u>CERTIFICATION</u>**

        I hereby certify that this Report and Recommendation was electronically filed this date and served upon counsel of record via the Court's ECF System.

Date:  June 26, 2012            By____s/Patricia T. Morris_____
                                    Law Clerk to Magistrate Judge Binder